UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————x

CHRISTOPHER H. JASPER,

                Plaintiff,

    -against-                               04 Civ. 7876 (CM)

SONY MUSIC ENTERTAINMENT, INC.,

                Defendant.

———————————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS COMPLAINT

McMahon, J.:

      Plaintiff Christopher Jasper, a former member of the well-known recording group "The Isley Brothers," sues Sony Music Entertainment, Inc. ("Sony") for allegedly infringing Jasper's copyright in four Isley Brothers works that were recorded between 1973 and 1976. Jasper admits that Sony (through its predecessor in interest, CBS) had a valid and binding exclusive license to exploit the Copyrighted Works, but contends that Sony's license did not extend through the Copyrighted Works' renewal term.[1] Jasper also asserts that Sony has failed to pay royalties due to him as co-author of the Copyrighted Works, and is instead paying those royalties to the wrong party pursuant to the terms of what he claims is the now-expired license.

      Defendant asks this court to dismiss the plaintiff's complaint for failure to state a claim. Sony argues that Jasper's copyright infringement claim fails as a matter of law for three reasons: (1) plaintiff concedes that defendant held a "license" in the Copyrighted Works and, thus, cannot

---

[1] The four Copyrighted Works at issue in this lawsuit are "3 & 3," created in 1973, "Live It Up," created in 1974, "The Heat Is On," created in 1975, and "Harvest for the World," created in 1976. (Complaint ("Cplt.") ¶ 12.)

be sued for infringement as a matter of law; (2) even if plaintiff did not grant defendant's predecessor-in-interest a license, his co-authors did, and their grant gives defendant the right to exploit the Copyrighted Works even without Jasper's permission; (3) plaintiff has failed to join his co-authors, Ronald and Rudolph Isley, who are necessary parties in this action.

For the following reasons, the defendant's motion to dismiss is granted and the case is dismissed with prejudice.

**Background**

In the late1950s, three brothers, Rudolph, Ronald and O'Kelly Isley ("Older Isleys") formed a three member musical group known as The Isley Brothers. The group became extremely popular.

During the 1960s, two younger Isley brothers, Marvin and Ernest, and a brother-in-law, plaintiff Christopher Jasper (together known as the "Younger Isleys"), performed frequently with The Isley Brothers. In 1973, the Younger Isleys became full members of The Isley Brothers. They wrote songs for the group between 1973 and 1983. During these years, album covers and copyright registrations listed all six members of the group as co-authors of the group's songs.

In 1969, before the group formally enlarged, the Older Isleys formed T-Neck Records, Inc. ("T-Neck"), their own record label, to receive and distribute performance royalties from the group's record sales. In 1973, the Older Isleys formed Bovina Music, Inc. ("Bovina") to administer the group's catalogue and collect the related royalties.

Also in 1973, T-Neck and the Older Isleys signed a contract with CBS Records, pursuant to which CBS was granted the right to manufacture, distribute, and sell Isley Brothers records. CBS in turn agreed to pay the group's copyright royalties and record royalties (a portion of

earnings from sales of recorded reproductions) to T-Neck. (Agreement Between T-Neck Records and CBS Records ("1973 Agreement") at 3B, 10, 21-22, Exhibit 2 to the Declaration of Cynthia S. Arato, dated December 3, 2004 ("Arato Decl.").) The Isley Brothers continued to record on the T-Neck label, and they produced several more successful albums that were distributed by CBS pursuant to this license.

In 1980, CBS agreed to add the Younger Isleys to the CBS Agreement. All six members of The Isley Brothers signed a modified version of the 1973 Agreement, as well as an attached letter of inducement dated August 1, 1980 ("Inducement Letter"). Subsequently, on January 1, 1981, all six Isleys signed a second letter of inducement that was attached to the contract between CBS and T-Neck ("1981 Modification").

Collectively, the 1973 Agreement, Inducement Letter, and 1981 Modification constitute the License through which CBS acquired certain rights (described more fully below) in the Copyrighted Works.

In 1988, Sony acquired CBS Records and succeeded to all CBS's rights in its existing contracts, including its contracts with the Isleys.

Unfortunately, the group's fortunes turned. In 1984, each of the three Older Isleys commenced Chapter 11 bankruptcy proceedings in New Jersey. These were converted to Chapter 7 liquidations the following year. (Findings of Fact and Conclusions of Law ("FFC") in <u>Jasper v. Bovina Music, Inc.</u>, No. 00 Civ. 0084 (BDP) (S.D.N.Y. April 26, 2001) (this lawsuit is hereinafter referred to as "<u>Jasper I</u>"), Arato Decl. Exh. 1. ¶¶ 25-26.) The Chapter 7 Trustee commenced an adversary proceeding against Jasper, contending that, as a partner in the Isley Brothers, he was both entitled to one-sixth of the group's royalties and liable for one-sixth of its

debts. This adversary proceeding settled in 1991. In the settlement, Jasper received $175,000 in exchange for a release of all of his current and future claims against Bovina and T-Neck. (FFC, at 13-15.)[2]

Ten years later, Jasper sued Bovina and T-Neck (Jasper I), alleging that both companies owed Jasper one-sixth of the royalties they had collected on the Isley Brothers' behalf since at least 1980, and perhaps earlier.[3] In 2002, the case was tried in a bench trial before The Hon. Barrington D. Parker. Judge Parker dismissed Jasper's claim against Bovina and T-Neck. Judge Parker found that Jasper had relinquished his right to receive publishing royalties from Bovina and performance royalties from T-Neck as part of the 1991 settlement of the Trustee's adversary proceeding. (FCC, at 13-15.) Because any right Bovina and T-Neck had to receive such royalties was derived from the License Agreement, Judge Parker specifically found that Jasper had become a party to that agreement by initialing the 1973 Agreement and signing the 1980 Letter of Inducement. (FFC, at 5). Judge Parker's verdict was affirmed on appeal. Jasper v. Bovina Music, 314 F.3d 42, 46-48 (2d Cir. 2002).

Barred from suing Bovina and T-Neck, Jasper now turns to Sony, which is paying the royalties to those entities (or at least to T-Neck). That lawsuit is this action, which I will refer to as "Jasper II." In the instant complaint, Jasper affirmatively pleads that Sony had an exclusive license to produce and distribute the four Copyrighted Works during their initial 28-year

---

[2] The Hon. Barrington D. Parker quotes Jasper's September 1991 release in his Findings of Fact and Conclusions of Law: "I [Jasper] release and give up any and all claims and rights which I may have against you [the Older Isleys, Bovina, and T-Neck Records]. This releases all claims, including those of which I am not aware and those not mentioned in this Release."

[3] The first recording at issue in Jasper I was created in 1973, but the complaint in that action alleges that no royalty payments had been made since 1980 (Cplt. in Jasper I, at 13).

copyright term. (Cplt. ¶ 9.) But he alleges that the right to renew those copyrights resided in him, not in Sony, so that he could reclaim his one-sixth ownership interest.[4] (Affidavit of Plaintiff Christopher H. Jasper in Opposition to Motion to Dismiss the Complaint ("Jasper Aff."), dated December 17, 2004, ¶¶ 2-3; Cplt. ¶¶ 7, 13, 15.) Jasper alleges that Sony has unlawfully and intentionally continued to produce and distribute the Copyrighted Works, and has unlawfully paid performance royalties to T-Neck instead of to Jasper. (Cplt. ¶¶ 16-18.) Plaintiff seeks to recover the royalties he claims were wrongfully paid to T-Neck, as well as statutory damages for each act of infringement by Sony, plus costs and attorney's fees.[5]

Jasper's current lawsuit is simply a second misguided attempt to obtain royalties he forfeited many years ago, when he settled the adversary proceeding in 1991. It must be, and is, dismissed.

**Standard of Review**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed if the plaintiff fails to state a claim upon which relief may be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The Court must draw all reasonable inferences from the complaint's allegations and "accept the material facts as alleged in the complaint as true." Frasier v. General Electric Co., 930 F.2d 1004, 1007 (2d Cir. 1991) (citation omitted). The Court must deny the defendant's motion "unless it appears beyond

---

[4] The oldest of the Copyrighted Works entered its renewal term in 2001. The three subsequent recordings became eligible for renewal in 2002, 2003, and 2004, respectively. (Cplt. ¶ 12.)

[5] The Court notes that Mr. Jasper's attorney in this action is his wife, who identified herself as such at the Rule 16 conference held in this case.

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Stewart v. Jackson & Nash, 976 F.2d 86, 87 (2d Cir. 1992) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

In considering a motion to dismiss, the court is limited to the contents of the complaint. However, "complaint" has been construed to include "the facts stated in the complaint *or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.*" Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991) (emphasis added). Thus, documents and statements that are not attached to or quoted in the complaint itself, but that are incorporated by reference into the complaint and are essential to its allegations, may be considered on a motion to dismiss without converting the motion to a motion for summary judgment. Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (citations omitted). The classic examples of documents that may be considered on a motion to dismiss even though the plaintiff does not physically attach them to the complaint are the contracts that underlie the claims in suit – such as, in this action, where plaintiff affirmatively pleads the existence of a license but claims that the license has expired, the license documents themselves.

Therefore, in ascertaining whether plaintiff has stated a claim for copyright infringement, this court may examine the text of the 1973 Agreement, 1980 Inducement Letter, and 1981 Modification.

On a motion to dismiss, a court may also consider matters "of which judicial notice may be taken under Fed. R. Evid. 201." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991). Included among such matters are public records, including pleadings, testimony, and decisions in prior lawsuits. See generally Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000)

(holding that courts may properly take judicial notice of pleadings from other lawsuits attached to the defendant's motion to dismiss); <u>Nova Info. Sys. v. Premier Operations, Ltd.</u>, 294 B.R. 213 (S.D.N.Y. 2003) (taking judicial notice of the Florida district court's <u>Nova</u> opinion as a public record); <u>Young v. Selsky</u>, 41 F.3d 47, 50 (2d Cir. 1994) (taking judicial notice of defendant's testimony in a previous action). Thus, this Court may examine Jasper's Complaint in <u>Jasper I</u>, transcripts of Jasper's testimony from <u>Jasper I</u>, Judge Parker's Findings of Fact and Conclusions of Law, and Judge Newman's opinion on appeal in considering the current action.[6]

However, I take notice of these documents only to the extent that they indicate that certain judicial proceedings occurred and that certain findings and averments were made. The findings and decisions of others courts only address the record in that action, not the present allegations. Properly limiting the scope of judicial notice is especially important in a motion to dismiss, where the issues raised in the instant complaint have not been fully litigated. <u>City of Amsterdam v. Daniel Goldreyer, Ltd.</u>, 882 F. Supp. 1273, 1279 (E.D.N.Y. 1995) (recognizing that judicial notice could be taken of the contents of affidavits from a former action to illustrate that certain factual averments were made, but not to verify the truth of such statements.) Here, the fact that Jasper made certain factual averments in <u>Jasper I</u> is relevant to one of Sony's arguments – judicial estoppel – so I am able to take notice of the fact that certain statements were made and positions were taken by Jasper in that earlier lawsuit.

---

[6] The plaintiff's reference to the 1973 and 1980 Agreements in his previous lawsuit against Bovina and T-Neck provides further basis upon which this Court may consider these documents in the defendant's current motion to dismiss. The primary reason for converting 12(b)(6) motions to summary judgment is the interest in providing notice and an opportunity to respond to the plaintiff. <u>Cortec</u>, <u>supra</u>, 949 F.2d at 48. That the plaintiff previously acknowledged these documents in judicial proceedings alleviates such due process concerns.

**Summary of Holding**

It is a hallmark principle of copyright law that licensors may not sue their licensees for copyright infringement. <u>United States Naval Inst. v. Charter Communications, Inc.</u>, 936 F.2d 692, 695 (2d Cir. 1991) ("Hence, an exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."). Jasper's claim that Sony has infringed the four Copyrighted Works fails as a matter of law because Sony holds a valid exclusive license, signed by Jasper and the other five Isleys, that gives it the right to exploit these recordings – not only during their original term of copyright (as Jasper admits), but in their initial renewal term as well. The terms of the governing contracts are clear, and Jasper is barred by principles of former adjudication – including both collateral estoppel and judicial estoppel – from asserting that he is not a party to the 1973 Agreement and its modifications. While the law permits Jasper and his co-authors to disavow any grant of renewal rights in the Copyrighted Works after the first renewal term expires, they cannot do so until another three decades have passed. Therefore, Jasper has no present right to renew the copyrights in the Copyrighted Works in his own name, in contravention of the clear terms of the license agreements he signed. Sony's exercise of its license rights during the renewal term is thus not infringement, and the complaint must be dismissed.

Moreover, even if Jasper were able to assert that he did not sign the relevant agreements or that he was fraudulently induced to do so (which, in view of positions he took in <u>Jasper I</u>, he cannot), the fact that Ronald and Rudolph Isley (both of whom are still alive) gave Sony's predecessor-in-interest a license to renew the copyrights and exploit the works during at least

their initial renewal term bars Jasper's claim as a matter of law.

**1. The 1973 Agreement and 1981 Modification Explicitly Grant CBS the Right to Produce and Distribute the Four Recordings at Issue, to Renew All Copyrights, and to Pay Royalties to T-Neck**.

On March 16, 1973, T-Neck and CBS agreed that CBS would distribute The Isley Brothers' records and pay royalties realized from the sale of those records to T-Neck. The contract stipulated that all master recordings would be CBS's property and explicitly gave CBS the right to renew the copyrights in covered works after 28 years and to exploit the works through their renewal terms:

> All master recordings made hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our [i.e., CBS's] property, free from any claims whatsoever by you or the Artist or any person deriving any rights or interests from you or the Artist; however, for purposes of Federal copyright registration, we shall copyright such master recordings in your name as the owner and author thereof and [we shall] secure any and all renewals of such copyright in your name. Without limiting the generality of the foregoing, we (including other divisions of our company) and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture, by any method now or hereafter known, phonograph records and other reproductions, on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(Arato Decl. Exh. 2 ¶ 4(a)(1) (emphasis added).) The 1973 Agreement was signed by T-Neck and CBS. The Older Isleys (O'Kelly, Ronald, and Rudolf) agreed to the terms of the contract and signed an attached inducement letter.

The 1981 Modification reiterated CBS's ownership of the Copyrighted Works, including

its right to renew the copyrights and exploit the works during their renewal terms:

> Each Master Recording made under this agreement, from the Inception of the Recording, will be considered a 'work made for hire' for CBS, and will be deemed transferred to CBS by this agreement, together with all rights in it, if it is determined not to be such a work . . . CBS shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright throughout the world . . . . Without limiting the generality of the foregoing, CBS and any Person authorized by CBS shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

(Arato Decl. Exh. 5, at 5-6 (emphasis added).) The addendum to the 1981 Modification stated that CBS had no obligation to make payments to any of the Isleys in connection with services they rendered under the revised contract. (Arato Decl. Exh. 5, at 14.) Jasper concedes that Sony has paid royalties to T-Neck and continues to do so during the renewal period, as Sony is required to do pursuant to its license. (Cplt. ¶¶ 10, 17; 1973 Agreement (Arato Decl. Exh. 2 ¶¶ 8-9).)

Jasper argues that the assignment of renewal term rights in the 1973 Agreement is ineffective to bar him from claiming the right to renew the copyrights personally. He avers in his complaint that, while Sony had an exclusive license for the first 28 years, he himself has filed renewal applications for the Copyrighted Works when those initial terms expired, and thus reclaimed his one-sixth ownership in the works. (Cplt. ¶¶ 9, 13, 15.) As a matter of law, Jasper is wrong.

In a decision reached when the 1909 Copyright Act was still in force, the United States Supreme Court held that "an assignment by an author of his renewal rights made before the original copyright expires is valid against the world, if the author is alive at the commencement of the renewal period." <u>Miller Music Corp. v. Charles N. Daniels, Inc.</u>, 362 U.S. 373, 375 (1960). The 1976 Copyright Act, which made major changes in pre-existing copyright law, did not change that – at least as to the initial renewal term – for copyrights that were subsisting in their first term on January 1, 1978, when the 1976 Act took effect. Since all four copyrights at issue in this case were subsisting on January 1, 1978, and since at least three of the original six authors of those songs – including, ironically, plaintiff himself – were alive when the first renewal terms commenced, <u>Miller Music</u> governs and dictates the result of this case.

Neither in his complaint nor in his brief does plaintiff articulate a theory of how, at the commencement of the renewal term, the copyrights – which were specifically assigned to CBS through the renewal terms – reverted to him and the other Isleys. Because I must not dismiss the complaint unless plaintiff cannot possibly recover under any theory, I looked into the changes that the 1976 Copyright Act worked in an author's right to recover ownership of his copyrights during their renewals terms. Under the 1976 Act, assignments of copyrights that were subsisting in their first term on January 1, 1978 – other than copyrights in works made for hire – may be terminated at any time during a period beginning fifty-six years from the date the copyright was originally secured and ending five years later – or, to be more succinct, the grants may be terminated at the end of the first renewal term. 17 U.S.C. § 304(c)(3) (1996 & Supp. 2005). This provision was inserted into the 1976 Act to avoid giving existing grantees (such as CBS) a windfall from the 1976 Act's extension of the renewal term beyond the 56th year from the date

the original copyright issued. Daniel A. Saunders, <u>Copyright Law's Broken Rear Window: An</u> <u>Appraisal of Damage and Estimate of Repair</u>, 80 Calif. L. Rev. 179, 189 (1992). So in the case of the earliest Copyrighted Work in this case, which was created in 1973, Jasper may not terminate until the first renewal term expires, which will be in 2034. <u>See</u> 3 <u>Nimmer on Copyright</u>, § 11.05[B][1] (2003).[7]

This case falls squarely within the Supreme Court's reasoning in <u>Miller Music</u>. Though O'Kelly Isley had passed away by 2002, and therefore was not alive when the first Copyrighted Work entered its renewal term, at least Ronald and Rudolph Isley, who signed the 1973 Agreement before the original copyrights in the Copyrighted Works expired, are still alive and were alive when all of the four Copyrighted Works at issue here entered their renewal period.[8] Since a joint author has an equal and undivided interest in the whole work, and may use or

---

[7] The author's ability to recapture his assigned copyright under the 1976 Act did not extend to works for hire, because it is the employer, not the actual creator, who is deemed the author of a work for hire under the 1976 Act. 17 U.S.C. § 201(b). In the 1981 Modification (Arato Decl. Exh. 5, at 5) all the Isley Brothers' recordings covered by the license (which includes the Copyrighted Works) were retroactively denominated as "works for hire." It has been held that an attempt to prevent authors of works copyrighted under the 1909 Act from exercising their statutory right to terminate the license after the end of the first renewal term, by retroactively denominating the copyrighted work as a "work for hire," fails. <u>Marvel Characters v. Simon</u>, 310 F.3d 280, 288 (2d Cir. 2002); <u>Playboy Enters. v. Dumas</u>, 53 F.3d 549, 559 (2d Cir. 1995). This does not, however, affect Jasper's rights vis-a-vis Sony today. It will affect them 30 years from now.

[8] In his 2002 opinion, Judge Newman noted that O'Kelly Isley had passed away. <u>Jasper v. Bovina</u>, 314 F.3d at 45. I conclude that Rudolph and Ronald Isley are still alive from Jasper's Memorandum of Law in opposition to Defendant's Motion to Dismiss for Failure to Add Indispensable Parties. There, Jasper argues, not that Rudolph and Ronald are dead, but that they are not indispensable parties. He also asserts that they have failed to pay Jasper renewal royalties – something they could not do it they were dead. (Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated December 17, 2004, at 24.)

license the work as he wishes, their signatures are sufficient to give Sony, as CBS's successor-in-interest, the exclusive license to exploit the Copyrighted Works throughout the life of the copyright, including the renewal term. Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998). Thus, because Ronald and Rudolph Isley legally surrendered the Older Isleys' right to renew the copyright for the Copyrighted Works when he signed the 1973 Agreement and 1981 Modification, and because they were alive at the commencement of the renewal period for each of the Copyrighted Works, Jasper has no right of recapture.

For that matter, Jasper is alive today and was alive at the commencement of the renewal term for each of the Copyrighted Works. When he signed onto the 1973 Agreement and the 1981 Modification, he legally surrendered to CBS (and thence to Sony) his right to renew the copyright in the Copyrighted Works for at least the first renewal term and he has no statutory or contractual right to recapture it at the present time.

Sony cannot have infringed Jasper's copyright in the Copyrighted Works because it has a license pursuant to which the copyright has been assigned to it. Plaintiff's claim for copyright infringement is thus fatally flawed.

**2. Christopher Jasper Assented to the Terms of the 1973 Agreement in 1980 And Cannot Be Heard to Claim Otherwise**.

Confronted with this reasoning in Sony's Motion to Dismiss, Jasper responded with the assertion that he is not a party to the 1973 Agreement as modified. Unfortunately, the documents themselves belie that claim, and Jasper is estopped to contend otherwise.

The documents comprising the License all bear plaintiff's signature and initials on their face. On August 1, 1980, all six Isleys signed the Inducement Letter, which was attached to a modification of the 1973 Agreement that made the Younger Isleys parties to the original agreement and bound them to the contract between T-Neck and CBS. (Arato Decl. Exh. 3, ¶ 3.) The final paragraph of this letter reiterated that CBS Records had no obligation to pay royalties directly to Jasper or any other member of the group: "The undersigned hereby acknowledge that CBS Records shall be under no obligation to make any payments whatsoever to the undersigned in connection with the services rendered by the undersigned and/or the fulfillment of the undersigned's obligations pursuant to the foregoing agreement."(Arato Decl. Exh. 3, at 2.) Also, Ernest and Marvin Isley and Christopher Jasper signed an agreement with CBS acknowledging that they had each read updated copies of the 1973 Agreement. And each of them initialed every page of a copy of the 1973 contract, copies of which were attached to their Inducement Letters. (Arato Decl. Exh. 4, at 1.)

In his affidavit in opposition to the motion to dismiss, Jasper contends that he was not a party to the 1973 Agreement, and that no copy of the 1973 Agreement was attached to the Inducement Letter he signed in 1980. (Jasper Aff. ¶¶ 8, 17.) However, Judge Parker found otherwise in Jasper I. In his Findings of Fact and Conclusions of Law, Judge Parker expressly concluded as follows: "On April 1, 1980, the Younger Isleys signed the CBS [1973] Agreement, initialing each page, and agreed to be bound by its terms." (FFC, at 5.)

Ordinarily, Judge Parker's findings would be preclusive against Jasper under the doctrine of non-mutual defensive collateral estoppel. This form of estoppel bars relitigation of an issue of law or fact that was raised, fully litigated and decided in a previous lawsuit, and essential to that judgment. NLRB v. United Technologies Corp., 706 F.2d 1254, 1260 (2d Cir. 1983) (citations omitted). The term "non-mutual" indicates that a new defendant in the plaintiff's second lawsuit may defensively invoke collateral estoppel regarding issues of law or fact decided in the plaintiff's first action. See Blonder-Tongue Lab. v. University of Illinois Found., 402 U.S. 313, 350 (1971) (holding that mutuality of parties was no longer a requirement of collateral estoppel). By binding the plaintiff to earlier judicial decisions in which he was a party, defensive collateral estoppel precludes a plaintiff from getting a second bite at the apple merely by choosing a new adversary. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329 (1979); Johnston v. Arbitrium (Cayman Islands) Handels AG, 198 F.3d 342, 348 (2d Cir. 1999). Jasper was obviously a party to Jasper I, and so he is bound by the findings of fact made by Judge Parker that were necessary to the verdict.

The key term here is "necessary to the verdict." Sony does not argue that Judge Parker's finding was necessary to his verdict. I assume this is because Judge Parker ultimately rested his decision on the fact that plaintiff gave up all his claims against T-Neck and Bovina in the settlement reached in the 1991 adversary proceeding. One could argue otherwise, but as defendant does not make this argument, I turn to the argument it does make, which is that Jasper is judicially estopped to assert that he is not party to the License Agreements.

Also called preclusion against inconsistent positions, judicial estoppel prevents a party from asserting the opposite of position he took in a prior lawsuit in order to gain some advantage

in a subsequent action. <u>TM Patents, L.P. v. IBM</u>, 121 F. Supp. 2d 349, 360 (S.D.N.Y. 2000); <u>David v. Showtime/Movie Channel, Inc.</u>, 697 F. Supp. 752, 762-63 (S.D.N.Y. 1988). Judicial estoppel is an equitable remedy designed to protect the integrity of the judicial process and to prevent parties from playing "fast and loose" with the courts. It may be invoked at the court's discretion, <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001), as long as two requirements are met: (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding; and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." <u>Mitchell v. Washingtonville Central School District</u>, 190 F. 3d 1, 6 (2d Cir. 1999).

Jasper's current contentions regarding the License are fundamentally at odds with the position he asserted in <u>Jasper I</u>. In his complaint in <u>Jasper I</u>, he affirmatively pled that he signed the 1980 Inducement Letter and agreed to be bound by the terms of the 1973 Agreement between CBS and T-Neck. (Amended Verified Complaint in <u>Jasper I</u>, at 10-14, Exhibit 2 to the Supplemental Declaration of Cynthia S. Arato, dated December 3, 2004 ("Supp. Arato Decl."). He so contended because his position in <u>Jasper I</u> was that he was signed directly to CBS and not to T-Neck, which he contended meant that T-Neck was illegally collecting and retaining performance royalties payments from Sony that should have gone directly to plaintiff. In this action, Jasper avers the exact opposite proposition—i.e., that he did not become a party to the 1973 Agreement via signing the 1980 Inducement Letter. This contradicts various statements he made in <u>Jasper I</u>. For example, in the complaint in <u>Jasper I</u>, Jasper averred that *all six Isleys* (which would include plaintiff) signed a recording agreement with CBS in 1980. (Supp. Arato Decl., Exh. 2 ¶ 65.) And Jasper testified under oath in <u>Jasper I</u> that he saw and initialed each

16

page of the 1973 Agreement when he signed the Inducement Letter in 1980:

> Q: Did there come a time when you signed an agreement with CBS Records?
>
> A: Yes.
>
> . . . .
>
> Q: You see this is an agreement dated March 16, 1973.
>
> A: Yes.
>
> Q: And there are a whole bunch of initials at the bottom. Are one of those initials yours?
>
> A: *Yes, it is.*
>
> Q: Which one? CJ.
>
> A: I don't know how clear it is, but yes, CJ.
>
> Q: And just flip through that. Is your initial on every page here?
>
> . . . .
>
> A: *It seems to be initialed on every page.*
>
> Q: Do you remember the circumstances under which you initialed each of these pages?
>
> A: It was in connection with another document.
>
> Q: Do you want to look at [the 1980 Inducement Letter]? Is that your signature on the top?
>
> A: *Yes.*
>
> . . . .
>
> Q: My point is, you signed the [1980 Inducement Letter], and it was about that time or maybe the same time that you initialed the earlier agreement?
>
> A: *Yes, about the same time.*
>
> Q: Okay. And at that point, CBS Records had the right to use your performance, correct, pursuant to this agreement?
>
> A: At that point.

(Trial Trans. at 391:12-392:9; 393:2-8 (emphasis added).)

Another example: in this action, Jasper claims that he "[does] not recall seeing and/or

17

signing a number of other documents Defendant has attached to their motion" and suggests that O'Kelly Isley had signed Jasper's name to CBS documents without Jasper's knowledge or consent. (Jasper Aff., ¶ 20.) In <u>Jasper I</u>, however, Jasper testified that he signed the 1981 Modification:

> Q: Were there modifications of this CBS/T-Neck Agreement in later years?
>
> A: I think it was.
>
> . . . .
>
> Q: How about Exhibit W, January 1, 1981, T-Neck Records, CBS Records? Take a look at Page 14. Is that your signature?
>
> A: That looks more like my signature.

(Trial Trans. at 393:9-11; 394:16-19.)

Thus, the first of the two conditions for invocation of judicial estoppel is amply met in Jasper's case.

Of course, there is a second condition – namely, that the court in the first action have adopted the position taken by the litigant in the prior action "in some manner." The example of "adoption" most often used is a favorable verdict. Jasper did not win a favorable verdict in <u>Jasper I</u>. But the prior court most certainly adopted his position. Based on Jasper's sworn testimony, Judge Parker made an explicit finding of fact in <u>Jasper I</u> that, "The Younger Isleys signed the CBS Agreement, initialing each page, and agreed to be bound by its terms." (FFC, ¶ 12.) The Second Circuit reached the identical conclusion: "In April 1980, the Younger Isleys signed the CBS agreement and agreed to be bound by its terms, *thereby joining the Older Isleys in designating CBS to distribute the Group's records and collect record royalties to be paid to T-Neck."* <u>Jasper v. Bovina Music, Inc.</u>, 314 F.3d 42, 47 (2d Cir. 2002) (Emphasis added).

Thus, in an exercise of my discretion, I can invoke judicial estoppel and bar plaintiff from making the arguments he now raises – unless Jasper's assertion of inconsistent positions was inadvertent, the product of good faith mistake or unintentional error. Mitchell, supra, 190 F.3d at 6 (citing Simon v. Safelife Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997). Unfortunately for Jasper, there is no possible way these inconsistencies could have been inadvertent. Jasper took his positions in Jasper I in his complaint and in sworn testimony in order to buttress an argument that he believed would win the day in that action – namely, that T-Neck was wrongfully collecting and holding his share of The Isley Brothers' royalties, which should have been paid to him because he had a contract directly with CBS. (Cplt. in Jasper I ¶ 79). In this action – confronted with a clear legal impediment to his action under the doctrine that licensors cannot sue their licensees for copyright infringement – Jasper backpedals and asserts that he really wasn't a party to the CBS contracts after all. On the facts before me, there is absolutely no way I could conclude that Jasper made any sort of mistake – except the mistake of trying to pull the wool over the eyes of this court. Mitchell, supra, 190 F.3d at 6 (quoting Simon, supra, 128 F.3d at 73 (citations omitted)).

Thus, Jasper is judicially estopped from asserting here that he did not in fact sign the Inducement Letter in 1980 and thereby assent to the terms of the 1973 Agreement, that he did not see *and initial* every page of the 1973 Agreement when he signed the Inducement Letter; or that he did not sign the 1981 Modification. Since Jasper's only argument in opposition to Sony's motion to dismiss under the bar against infringement suits by licensors against their licensees is that he did not grant any license CBS (and hence Sony) – an argument he is not free to make – Sony's motion to dismiss on the ground that Jasper cannot maintain a suit against it for copyright

infringement must be granted.

### 3. Even if Jasper Did Not Assent to the Terms of the License, At Least One of Jasper's Co-Authors Consented and So Jasper's Copyright Infringement Claim is Barred.

Even if Jasper did not sign the licensing agreements, Jasper's claim still fails as a matter of law because Jasper's co-authors (the other Isley Brothers) granted Sony permission to exploit the Copyrighted Works.

It is basic copyright law that joint authors may legally grant a license to a third party to exploit the work without co-author consent. See 3 Nimmer on Copyright § 610 (2003). Joint authors of a work all possess equal undivided interests in the whole work, such that each co-author may use or license the work to a third party. Thomson, supra, 147 F. 3d at 199; see also Cmty. for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint authors co-owning copyright in a work 'are deemed to be tenants in common,' which 'each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby.'") (citation omitted), aff'd without consideration on this point, 490 U.S. 730 (1989). Moreover, licensees have no obligation to co-authors with whom they do not contract. Lindsay v. Wrecked and Abandoned Vessel R.M.S. Titanic, No. 97 Civ. 9248(HB), 1999 WL 816163, at *7 (S.D.N.Y. Oct. 13, 1999).

So as long as any Isley Brother licensed these rights to CBS/Sony, Jasper cannot assert a claim for infringement against Sony.

Though Jasper insists here that he was not a party to the 1973 Agreement, he affirmatively pleads that Sony "has had an exclusive license to produce and distribute the Copyrighted recordings to the public." (Cplt. ¶ 9.) That exclusive license was granted via the

Though Jasper insists here that he was not a party to the 1973 Agreement, he affirmatively pleads that Sony "has had an exclusive license to produce and distribute the Copyrighted recordings to the public." (Cplt. ¶ 9.) That exclusive license was granted via the 1973 Agreement, which was signed in 1973 by O'Kelly, Ronald, and Rudolph Isley, and initialed seven years later by Ernest and Marvin Isley (and plaintiff, but we will ignore that incontrovertible fact for the moment). (Arato Decl. Exhs. 2-4.) The terms of those licenses encompass the renewal term (Arato Decl. Exh. 2 ¶ 4(a)(1).), during which time Jasper concedes that Sony has continued to pay royalties to T-Neck, in accordance with the terms of the license. (Cplt. ¶¶ 10, 17); 1973 Agreement (Arato Decl. Exh. 2 ¶¶ 8-9).) So even if Jasper had not signed the 1981 Modification to the License, the fact that the other five Isleys did sign it means that CBS had no obligation to pay Jasper directly for any services rendered under the license agreement. (Arato Decl. Exh. 5, at 14.)

**Conclusion**

For the reasons stated above, the complaint in this action is dismissed with prejudice and with costs to defendant. That being so, it is not necessary to address defendant's contention that the two original Isley Brothers still living – Rudolph and Ronald – are necessary parties to this action. The Clerk of the Court is directed to close the file.

This constitutes the decision and order of the Court.

Dated: June 30, 2005

_____

U.S.D.J.